UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SONNY JAMES MORALES,<br><br>    Petitioner,<br><br> v.<br><br>A. COVELLO,<br><br>    Respondent. | Case No. 1:20-cv-00894-KES-HBK (HC)<br><br>FINDINGS AND RECOMMENDATIONS TO DENY PETITIONER'S PETITION AND DECLINE TO ISSUE A CERTIFICATE OF APPEALABILITY [1]<br><br>FOURTEEN-DAY OBJECTION PERIOD |

## I. STATUS

Petitioner Sonny James Morales ("Petitioner" or "Morales"), a state prisoner, is proceeding pro se on his Petition for Writ of Habeas Corpus filed under 28 U. S.C. § 2254 on June 29, 2020.  (Doc. No. 1, "Petition").  Petitioner challenges his judgement of conviction after a jury trial for: (1) child abuse in violation of Penal Code § 273a(a) and (2) corporal injury to a child in violation of Penal Code § 273d(a), for which he was sentenced by the Fresno County Superior Court to an aggregate term of twenty-one years, consisting of the upper term of six years on count 1, doubled pursuant to the "Three Strikes" law, plus four years for the Section 12022.7(d) great bodily injury enhancement and five years for the prior serious felony.[2]  (Case

---

[1] This matter was referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 302 (E.D. Cal. 2022).

[2] Sentence for count 2 was stayed pursuant to section 654 and the court struck the two prior prison term

1

No. F14907189). (Doc. No. 19-1; Doc. No. 19-8 at 2).[3] The Fifth Appellate District Court remanded the matter to the trial court to permit it to consider striking appellant's prior serious felony enhancement, but otherwise affirmed Morales's judgment on direct appeal (Case No. F073064). (Doc. No. 19-8 at 24). On April 10, 2019, the California Supreme Court summarily denied Morales's petition for review (Case No. S253609). (Doc. No. 19-10).

The Petition presents one ground for relief: insufficient evidence to support conviction. (Doc. No. 1 at 5). The Petition is otherwise devoid of any facts, instead directing the reader to "see attached." (*Id.*). Attached to the Petition are two documents: (1) the Fifth Appellate District Court's January 9, 2019 Opinion (*Id.* at 16-39); and (2) a Motion to Stay. (*Id.* at 40-46, Doc. No. 7 (refiling duplicate motion to stay)). The Court previously addressed and denied Petitioner's Motion to Stay on December 15, 2020. (Doc. Nos. 9, 11).

Thereafter, Respondent filed an Answer (Doc. No. 18), arguing the sole ground for relief is without merit, and lodged the state court record in support (Doc. No. 19, 19-1 through 19-25). Petitioner elected not to file a reply. This matter is deemed submitted on the record before the Court. After careful review of the record and applicable law, the undersigned recommends the district court deny Petitioner relief on the sole ground of his Petition and decline to issue a certificate of appealability.

## II. GOVERNING LEGAL PRINCIPLES

### A. Evidentiary Hearing

In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007). "It follows that if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." *Id.* Here, the state courts adjudicated Petitioner's sole claim for relief on the merits. Petitioner does not

---

enhancements. (Case No. F14907189). (Doc. No. 19-8 at 2).
[3] All citations to the pleadings and record are to the page number as it appears on the Case Management and Electronic Case Filing ("CM/ECF") system.

seek an evidentiary hearing, and this Court finds that the pertinent facts of this case are fully developed in the record before the Court; thus, no evidentiary hearing is required. *Cullen v. Pinholster*, 563 U.S. 170 (2011).

## B.     ADEPA General Principles

A federal court's statutory authority to issue habeas corpus relief for persons in state custody is set forth in 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). AEDPA requires a state prisoner seeking federal habeas relief to first "exhaus[t] the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A). If the state courts do not adjudicate the prisoner's federal claim "on the merits," a *de novo* standard of review applies in the federal habeas proceeding; if the state courts do adjudicate the claim on the merits, then the AEDPA mandates a deferential, rather than *de novo*, review. *Kernan v. Hinojosa*, 136 S. Ct. 1603, 1604 (2016). This deferential standard, set forth in § 2254(d), permits relief on a claim adjudicated on the merits, but only if the adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). This standard is both mandatory and intentionally difficult to satisfy. *Sexton v. Beaudreaux*, 138 S. Ct. 2555, 2558 (2018); *White v. Woodall*, 572 U.S. 415, 419 (2014).

"Clearly established federal law" consists of the governing legal principles in the decisions of the United States Supreme Court when the state court issued its decision. *White*, 572 U.S. at 419. Habeas relief is appropriate only if the state court decision was "contrary to, or an unreasonable application of," that federal law. 28 U.S.C. § 2254(d)(1). A decision is "contrary to" clearly established federal law if the state court either: (1) applied a rule that contradicts the governing law set forth by Supreme Court case law; or (2) reached a different result from the Supreme Court when faced with materially indistinguishable facts. *Mitchell v. Esparza*, 540 U.S. 12, 16 (2003).

3

A state court decision involves an "unreasonable application" of the Supreme Court's precedents if the state court correctly identifies the governing legal principle, but applies it to the facts of the petitioner's case in an objectively unreasonable manner, *Brown v. Payton*, 544 U.S. 133, 134 (2005), or "if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Williams v. Taylor*, 529 U.S. 362, 407, (2000). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fair-minded jurists could disagree on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011). The petitioner must show that the state court decision "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id*. at 103.

When reviewing a claim under § 2254(d), any "determination of a factual issue made by a State court shall be presumed to be correct[,]" and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *Burt v. Titlow*, 571 U.S. 12, 18 (2013) ("[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance.") (quoting *Wood v. Allen*, 558 U.S. 290, 293 (2010)).

Even if a petitioner meets AEDPA's "difficult" standard, he must still show that any constitutional error had a "substantial and injurious effect or influence" on the verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). As the Supreme Court recently explained, while the passage of AEDPA "announced certain new conditions to [habeas] relief," it didn't eliminate *Brecht's* actual-prejudice requirement. *Brown v. Davenport*, ––– U.S. –––, 142 S. Ct. 1510, 1524, 212 L.Ed.2d 463 (2022). In other words, a habeas petitioner must satisfy *Brecht*, even if AEDPA applies. *See id*. at 1526 ("[O]ur equitable precedents remain applicable 'whether or not' AEDPA applies.") (*citing Fry v. Pliler*, 551 U.S. 112, 121 (2007)). In short, a "federal court must deny relief to a state habeas petitioner who fails to satisfy either [*Brecht*] or AEDPA. But to grant relief, a court must find that the petition has cleared both tests." *Id*. at 1524.

As discussed *supra*, for the deferential § 2254(d) standard to apply there must have been an "adjudication on the merits" in state court. An adjudication on the merits does not require that there be an opinion from the state court explaining the state court's reasoning. *Richter*, 562 U.S. at 98. "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Id*. at 99. "The presumption may be overcome when there is reason to think some other explanation for the state court's decision is more likely." *Id*. at 99-100. This presumption applies whether the state court fails to discuss all the claims or discusses some claims but not others. *Johnson v. Williams*, 568 U.S. 289, 293, 298-301 (2013).

While such a decision is an "adjudication on the merits," the federal habeas court must still determine the state court's reasons for its decision in order to apply the deferential standard. When the relevant state-court decision on the merits is not accompanied by its reasons,

> the federal court should "look through" the unexplained decision to the last related state-court decision that does provide a relevant rationale. It should then presume that the unexplained decision adopted the same reasoning. But the State may rebut the presumption by showing that the unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision, such as alternative grounds for affirmance that were briefed or argued to the state supreme court or obvious in the record it reviewed.

*Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018). The federal court "looks through" the silent state court decision "for a specific and narrow purpose—to identify the grounds for the higher court's decision, as AEDPA directs us to do." *Id*. at 1196.

### III.   RELEVANT FACTUAL BACKGROUND

The Court adopts the pertinent facts of the underlying offenses, as summarized by the California Fifth District Court of Appeal. A presumption of correctness applies to these facts. *See* 28 U.S.C. § 2254(e)(1); *Crittenden v. Chappell*, 804 F.3d 998, 1010-11 (9th Cir. 2015).

> Factual and Procedural Background
>
> The Appellant married Irene S.[FN2] on July 13, 2014. Irene had two small children, M. and F. They all lived with appellant in an apartment. In the early hours of July 29, 2014, F.'s feet and ankles

5

were severely burned by scalding water. As discussed below, the mechanism of F.'s injuries was disputed.

> [FN2] To protect the identity of the minor children, we refer to their mother only by her first name. For the same reason, we refer to the minors only by their first initials. No disrespect is intended.

A. F.'s Injuries

At about 2:50 a.m. on July 29, 2014, F. was examined by Dr. Lawrence Satkowiak, medical director for the emergency room at Valley Children's Hospital. Dr. Satkowiak was qualified at trial as an expert in emergency pediatric medicine.

Irene reported to Dr. Satkowiak that she and appellant awoke in the night to find F. standing in a sink of hot water. Dr. Satkowiak found that F.'s feet were burned in a "stocking glove pattern," meaning that the feet were completely burned from the ankles downward. The burn lines were well defined and sharply demarcated on both ankles at the same level. There were no splash marks on either leg. There was no area on the feet that was spared from the burns. Dr. Satkowiak explained that sparing occurs when parts of the skin are exposed to a lower temperature. This can occur if someone stands in a tub of freshly placed hot water, because the tub itself has not yet elevated to the same temperature as the water.

Dr. Satkowiak stated that F's injuries were indicative of "non-accident trauma or inflicted injury." Specifically, the clear demarcation lines and lack of splashing indicated that F. did not fight back or try to jump out of the water. The injuries were inconsistent with F. accidentally dipping his feet in scalding water, standing in a sink of water, or sitting in a sink basin with water running into the sink. Dr. Satkowiak stated it would be unusual for burns like this to result from someone accidentally putting their feet in hot water because most people would immediately step out of the water. Such conduct would likely result in splash burns, which F. did not have. Instead, the injuries were likely caused by an adult dunking F. in very hot water. Dr. Satkowiak explained:

> "This injury is really a classic injury we see. It is one of the reasons, when he came in, I immediately felt we needed to get the police involved. It's an injury that we see where a child is dunked into hot water, their feet are held there sustaining that burn.
>
> "You would need to have their—the foot in the water for an amount of time, depending on how hot the water is, to cause . . . a burn like this."

Dr. Satkowiak opined that a child the size of M., who was 34 months old, weighed 31.8 pounds, and was 37 inches tall, could not have caused the injuries to F., who weighed 30 pounds. Dr.

6

Satkowiak acknowledged that F. had no injuries to indicate he was held down or resisted.

Later that day, F. was transferred to the burn center at Community Regional Medical Center, where he was seen by Dr. William Dominic. F. had deep second-degree burns on both feet extending up to the ankle that were almost mirror images of each other. The burns were consistent with a scalding injury. The tops and bottoms of both feet were equally burned and there was a sharp line of demarcation on each leg. Dr. Dominic explained that the demarcation lines indicated F. was immobile at the time he was burned. Otherwise, Dr. Dominic would expect splash marks or an uneven burn. Based on these factors, Dr. Dominic opined that the injuries were "most likely" caused by F.'s lower extremities being immobilized by someone holding them. He stated the "most likely scenario" was that an adult held F. and dunked him in a scalding hot substance. Dr. Dominic acknowledged that F. had no other injuries but stated it was nonetheless possible he was restrained without suffering any bruises. He opined that it was "highly, highly unlikely" that M. could have caused the injuries. He also believed it was "highly unlikely" that F.'s injuries were accidental.

If F. had been standing in a level of water, Dr. Dominic would expect to find sparing on the bottoms of the feet, where they had touched the bottom of the sink. However, Dr. Dominic saw no sparing on F.'s feet. If F. had been sitting in the sink basin with water running out of the faucet and down the drain, Dr. Dominic would expect to see a ring mark or line of burn along F.'s leg or buttocks, and those portions of the body that were against the sink might not have burned. Dr. Dominic stated that a burn could occur within 5 to 20 seconds of exposure to water at 145 degrees. At 140 degrees, the time might be slightly longer, but still within seconds. At 150 degrees, a burn would occur in under five seconds. At 155 degrees, a burn would occur within a second or so.

B. The Investigation

Detective Joshua Alexander interviewed appellant on the morning on July 29, 2014, at the Fresno Police Department. Appellant stated that he heard knocking and came out of his room. He saw a mess in the living room. The kids had stacked a child's table and chairs to get up to the kitchen counter. M. got off the table and her shirt was wet. F. was sitting in the sink. Water was running and F. was playing with the water. He was not crying. The other side of the sink had dishes in it. The kids had clothes on when they went to sleep but, by this point F. was wearing only a shirt and a diaper. F. takes his clothes off in the middle of the night.

Appellant pulled F. from the sink. Appellant tried to put F. down but F. complained. Appellant took F. to Irene in the bedroom and went to start cleaning up. F. was not screaming and appellant did not know there was a problem until Irene called him back to the room. They called for a ride to the hospital right away. At some point, their neighbor, Shawn, came by. Irene's uncle took them to the hospital. They stopped on the way to get milk for M. F. was

7

crying on and off at that point. Appellant stated either F. or M. had to have caused the injuries.

An emergency response social worker for Fresno County Department of Children and Family Services interviewed appellant on July 30, 2014, at the Fresno County Jail. Appellant stated that he awoke in the night to use the restroom and inadvertently closed the bedroom door when he returned to bed. Irene usually kept the door open to hear the kids. Appellant later woke up again and thought he heard knocking. He got up and found items from the kitchen cupboards scattered around the kitchen and living room. M. came running out of the kitchen screaming with her hands over her ears. She looked like she thought she was going to get in trouble. F. was squatting in the kitchen sink playing. Appellant thought the water was dribbling out of the sink. He touched the water but did not remember it being warm. He took F. to Irene in the bedroom. Irene started screaming, asking what happened to F.'s feet. Irene and appellant eventually took F. to the hospital.

Detective Alexander also interviewed Irene. Irene stated that appellant has a short temper and calls her a "lazy bitch," particularly when she sleeps all day, as she did on the day of the incident. Appellant also gets mad when the children make a mess. The week before this incident, appellant had gotten physical with her and she called 911. When the police came, she denied that anything had happened because she did not want appellant to get in trouble. The 911 call was admitted into evidence and played for the jury.

Law enforcement officials, including Detective Alexander, visited the apartment. The apartment was filthy and had a disturbing stench. The carpet was stained and bird feces were on the carpet. Fly strips filled with flies hung from the ceiling. There were cockroaches and flies throughout the residence. Numerous cockroaches around the sink appeared to be eating skin tissue. One side of the sink contained a stack of dishes and a pair of pajama bottoms. The pajamas were wet and it appeared they would fit F. Two large pieces of skin were found on the bottom of the sink under the dishes. Smaller pieces of skin were on the other side of the sink. The skin appeared to have come from a person's feet. Detective Alexander found a water-soaked diaper in the restroom trash can.

A child's table and chair were located near the regular kitchen table. Officers moved the child's table and chair next to the sink to determine their height relationship to the sink. The counter in the kitchen was 37 and three-eighth inches tall. The child's table was 17 and one-half inches tall and the seat of the chair was 10 and one-fourth inches tall. The water heater was in the northwest corner of the kitchen and its thermostat was set to the maximum, hot position. Two water temperature tests were performed. In the first test, the water tested at 10 seconds was 60 degrees. After 40 seconds, it was 100 degrees. After 90 seconds, it was 145 degrees, which was the peak temperature. The temperature of water from the bathtub faucet ranged from 125 degrees after 10 seconds to 155 degrees

8

after 60 seconds. In the second test, the water from the kitchen sink was 65 degrees after 10 seconds. At 20 seconds, it was 100 degrees. At 40 seconds, it was 125 degrees. At 60 seconds, it was 140 degrees. The bathroom sink temperature peaked at 155 degrees, as did the bathtub faucet.

Detective Alexander attempted to speak with appellant's neighbor, Shawn. Shawn began to speak with Alexander but then his cell phone rang and he walked away. Shawn received a call from appellant, who was in jail. Appellant asked Shawn if a crime scene unit was at the apartment, and Shawn responded that he was speaking with an investigator. Appellant informed Shawn, "I told them that you knocked on the door and all that . . . ." He also stated, "I told them I heard knocking I left the door open and I went to get the baby and so I notice that baby was, well he was burning and that's when you walked in." After the call, Shawn was less cooperative with Detective Alexander. A specialized interviewer attempted to interview M., but she did not respond to questions.

C. The Defense Case

The defense pointed to weaknesses in the circumstantial evidence to argue that F.'s injuries may have been accidental. The defense also pointed to inconsistencies in statements made by Irene to argue that she may have inflicted the injuries herself.

Irene testified that she put M. and F. to bed in their bedroom and went into her own bedroom to watch a movie with appellant. Both kids were wearing pajamas and F. also was wearing a diaper. Irene fell asleep before appellant.

Irene was later awakened by appellant shaking her and stating that M. and F. made a mess in the kitchen. Appellant walked out of the room. He returned a minute or two later holding F. F. was not making any noise. His feet were "bloodshot red." He had no skin on his feet. Irene jumped out of bed and started "freaking out" on appellant. Appellant said he had "no clue" what happened. Irene called her sister and uncle for a ride to the hospital. About five minutes later, Shawn came over and put aloe vera on F.'s feet.

While waiting for a ride, Irene cleaned up the kitchen. The child's table was pushed against the sink with the child's chair on top. There was typewriter ink everywhere and food from the refrigerator was out. She did not clean up the sink area. In one side of the sink was a stack of dishes with F.'s diaper on top. In the other side of the sink, Irene saw F.'s skin and she placed a dish on top because she knew the police would be called. She did not call 911 because she had been told by 911 operators that they would not respond to her house due to a history of false calls.

M. and F. had a history of making messes in the kitchen, but not late at night. They climbed on things, but not in the kitchen. Neither F. nor M. had ever played with the sink before. They know how to turn on the bathtub but do not "mess with" the sink.

9

> After about 45 minutes, Irene's uncle came and took them to the hospital. They stopped on the way to purchase milk for M.
>
> Prior to trial, Irene gave several statements regarding the incident, some of which were inconsistent with her trial testimony. For example, Irene told the first responding officer that she and appellant both heard screaming and went to the kitchen to find both children on the kitchen counter, with F.'s feet in a sink of hot water. She also initially stated that they proceeded directly to the hospital, then stated in another interview that they stopped for gas. In one interview, she stated that her kids never wear pajamas, and that they had played in the sink before. At various times, she stated that appellant had blocked her phone from calling 911 or that appellant had told her not to call 911. At one point, Irene stated that she and appellant had been married two years. At another point, she stated that they had been married for four or five months. In yet another interview, she could not recall whether they had married in June or July of 2014.

(Doc. No. 19-8 at 3-9).

## IV.  ANALYSIS

Respondent acknowledges that Petitioner's single ground for relief was raised on direct appeal to the Fifth Appellate District Court, denied on the merits (Doc. No. 19-8), subsequently raised, and summarily denied by the California Supreme Court (Doc. No. 19-10). Petitioner alleges, without supporting facts in the Petition itself, that there was insufficient evidence to support his convictions. (Doc. No. 1 at 5). Presumably in support of this claim, Petitioner seeks to raise the same grounds that were addressed and ultimately rejected by the Fifth Appellate District. (*Id.* at 16-39). Therein, Petitioner argued that the circumstantial evidence was not strong enough to eliminate the possibility that F.'s injuries may have been accidental, and that inconsistencies in Irene's statements suggest that she may have inflicted the injuries rather than Petitioner. (*Id.* at 23).

### A. Insufficient Pleading

Initially, Petitioner's Petition is insufficient to provide a sufficient a basis for federal habeas relief. Rule 2(c) of the Rules Governing Section 2254 Cases states that a federal habeas petition must specify all grounds for relief and "state the facts supporting each ground." Rule 2(c) requires specific pleading of facts that, if proven to be true, would entitle the petitioner to federal habeas relief. While pro se pleadings are given the benefit of liberal construction, a

1  federal court is not required to construct legal arguments for a pro se petitioner.  *See Haines v.*
2  *Kerner,* 404 U.S. 519, 520-521 (1972); *see also Small v. Endicott,* 998 F.2d 411, 417-418 (7th
3  Cir. 1993).  Claims based on conclusory allegations are not a sufficient basis for federal habeas
4  relief.  *See Mayle v. Felix*, 545 U.S. 644, 655-56, (2005) (acknowledging that notice pleading is
5  insufficient to satisfy the specific pleading requirement for federal habeas petitions); *James v.*
6  *Borg*, 24 F.3d 20, 26 (9th Cir. 1994) ("[C]onclusory allegations which are not supported by a
7  statement of specific facts do not warrant habeas relief."); *see also Blackledge v. Allison*, 431
8  U.S. 63, 74, (1977).  Pro se petitioners may incorporate claims by reference when the petition
9  includes specific references to a document that is attached to the federal petition.  *Dye v.*
10 *Hofbauer*, 546 U.S. 1, (2005) (per curium) (applying Fed. R. Civ. P. 10(c) in habeas proceeding);
11 *See also Bowles v. Baca,* 2020 WL 7240097, at *10-11 (D. Nev., Dec. 9, 2020) ("However, there
12 is no authority permitting a federal habeas petitioner to incorporate claims from documents not
13 attached to the petition.").
14       As noted, here, the Petition refers the reader to "see attached."  (Doc. No. 1 at 5).  The
15 Court liberally construes this directive as an incorporation to the insufficiency claim raised on
16 direct appeal and rejected by the Fifth Appellate District Court (case No. F073064).  The Fifth
17 Appellate District's decision does make brief reference to the insufficient evidence claims
18 Petitioner brought before the state courts.  (Doc. No. 19-8 at 8-9).  The decision notes that, in
19 arguing for his defense, Petitioner "pointed to weaknesses in the circumstantial evidence to argue
20 that F.'s injuries may have been accidental," as well as "inconsistencies in statements made by
21 Irene to argue that she may have inflicted the injuries herself."  (*Id.* at 8).  The Petition, however,
22 does not incorporate any briefs submitted to the state courts which explain what weaknesses
23 Petitioner identified in the circumstantial evidence, or which statements made by Irene may
24 suggest she inflicted the injuries on F. herself.  As noted above, there is no authority permitting a
25 federal habeas petitioner to incorporate claims from documents not attached to the petition.
26 *Bowles,* 2020 WL 7240097, at *11.  Further, Petitioner does not identify how the state court's
27 decision was contrary to, or an unreasonable application of clearly established federal law.  Nor
28 does Petitioner contend that the facts upon which the state court relied were unreasonable.

11

Consequently, the Petition lacks specific pleading of facts that, if proven to be true, would entitle the petitioner to federal habeas relief as required by Rule 2(c) of the Rules Governing Section 2254 Cases. On this basis alone, the district court may dismiss the Petition.

**B. Merits Analysis**

In the alternative and given that Respondent has not objected to the deficiencies in the pleadings, the undersigned will consider Petitioner's insufficient evidence claim on the merits to the extent it was exhausted on direct appeal. Respondent argues that the state appeal court's denial of Petitioner's claim, which was undisturbed by the California Supreme Court, was not contrary to, nor an unreasonable application of, federal law. (Doc. No. 18 at 13-16 (citing Doc. No. 19-8 at 10-12)). Respondent contends that the state court reasonably rejected Petitioner's arguments. (Doc. No. 18 at 13).

**1. State Court Decision**

In denying Petitioner's insufficiency claim, the Fifth Appellate District court found as follows:

> *A. Standard of Review*
>
> As relevant here, a person is guilty of child abuse under section 273a, subdivision (a) when the person "having the care or custody of any child, willfully causes or permits the person or health of that child to be injured." (§ 273a, subd. (a).) Section 273d, subdivision (a), applies to anyone who "willfully inflicts upon a child any cruel or inhuman corporal punishment or an injury resulting in a traumatic condition." (§ 273d, subd. (a).) The sentencing enhancement for infliction of great bodily injury requires proof that the defendant personally inflicted great bodily injury on a child under the age of five years. (§ 12022.7, subd. (d).)
>
> "It is the prosecution's burden in a criminal case to prove every element of a crime beyond a reasonable doubt." (*People v. Cuevas* (1995) 12 Cal.4th 252, 260.) When reviewing a challenge to the sufficiency of the evidence, "we review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Cravens* (2012) 53 Cal.4th 500, 507.) " 'The focus of the substantial evidence test is on the *whole* record of evidence presented to the trier of fact, rather than on " 'isolated bits of evidence.' " ' " (*People v. Medina* (2009), 46 Cal.4th 913, 919.) "We must presume in support of the judgment the existence of every fact that the trier of fact could reasonably deduce from the

evidence." (*Ibid.*) "The conviction shall stand unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction]." ' " (*Cravens,* at p. 508.)

The standard of review is the same in cases in which a conviction is based primarily on circumstantial evidence. (*People v. Clark* (2016) 63 Cal.4th 522, 625 (*Clark*).) "In a case built solely on circumstantial evidence, none of the individual pieces of evidence 'alone' is sufficient to convict. The sufficiency of the individual components, however, is not the test on appeal." (*People v. Daya* (1994) 29 Cal.App.4th 697, 708.) Rather, we must determine "whether a reasonable trier of fact, considering the circumstantial evidence cumulatively, could have found the defendant guilty . . . beyond a reasonable doubt." (*Id.* at p. 709.) "We 'must accept logical inferences that the jury might have drawn from the circumstantial evidence.' " (*People v. Zamudio* (2008) 43 Cal.4th 327, 357; *Clark,* at p. 625.)

*B. Analysis*

Appellant contends that expert testimony regarding the cause of F.'s burns is too insubstantial to support a determination of guilt beyond a reasonable doubt. He points out that Dr. Satkowiak did not know what water temperature F. was exposed to and could not opine on the reaction time of a child. He points to Dr. Dominic's testimony that burns could occur within seconds at the sink's peak water temperature of 140 or 145 degrees, and the lack of injuries on either F. or appellant, to undermine the doctors' theory that F. was restrained. We conclude the evidence was sufficient to support the judgment.

Drs. Satkowiak and Dominic both opined that F.'s injuries were consistent with nonaccidental injuries caused by an adult immobilizing F.'s feet in hot water. They reached this conclusion based on the nature of F.'s injuries, specifically the sharp demarcation lines, even burns, lack of splash marks, and lack of sparing. Although they were unable to state their conclusions with absolute certainty, Dr. Satkowiak described this as a "classic injury" that occurs "where a child is dunked into hot water, their feet are held there sustaining that burn." Dr. Dominic acknowledged the "highly unlikely" possibility of accidental injury but stated the "most likely scenario" was an adult holding and dunking F. in a scalding hot substance. Dr. Dominic also explained that it is possible to immobilize a child without that child suffering any bruises. Additionally, Drs. Satkowiak and Dominic testified that the conduct described by appellant and Irene—that F. was either standing in a sink of hot water or sitting in the sink with water running down the drain—was not consistent with the injuries sustained.

Furthermore, the jury heard testimony that appellant had a history of becoming angry over Irene's laziness and the children making messes. Appellant awoke in the night to find the children had made a mess, he advised Irene of the mess, and he returned shortly thereafter with F. whose feet were severely burned. Cumulatively,

13

> the testimony is sufficient for the jury to have drawn a logical inference that F.'s injuries were not accidental, but instead were caused by appellant, the only adult purported to be with F. at the time the injuries occurred.
>
> The primary case relied on by appellant, *People v. Bassett* (1968) 69 Cal.2d 122, is distinguishable.  There, a jury found the defendant guilty on two counts of first degree murder, impliedly finding that the defendant had sufficient mental capacity to premeditate the murders.  (*Id.* at p. 124.)  This finding rested on the testimony of three expert psychiatrists presented by the prosecution.  (*Id.* at pp. 136-137.)  The Supreme Court reversed, finding the prosecution had not sustained its burden of proof.  Two of the prosecution's psychiatrists rendered their opinions without having examined the defendant.  (*Id.* at pp. 144-146.)  Their testimony was held insubstantial because they adduced no reasoning in support of their conclusions and did not attempt to refute the extensive defense evidence to the contrary.  (*Ibid.*) The opinion of the third psychiatrist, who had personally examined the defendant, was held insubstantial because it revealed that he labored under a misunderstanding of the term "premeditation."  (*Id.* at pp. 146--149.)
>
> Unlike in *Bassett,* a solid foundation was established for the testimony offered in this case.  The doctors examined F. and based their opinions on that examination.  The reasoning behind their conclusions was explained to the jury.  Both doctors addressed and refuted the suggestion of an accidental cause for F.'s injuries.  There is nothing to indicate either doctor labored under any legal or factual misunderstanding.  In other words, the type of evidence missing in *Bassett* was presented in this case.
>
> We hold there is sufficient evidence to support appellant's convictions.

(Doc. No. 19-8 at 9-12); *People v. Morales*, No. F073064

### 2. Governing Federal Law

The undersigned reviews the state court's reasoned decision under the deferential standard of review applying clearly established federal law.  The Due Process Clause of the Fourteenth Amendment protects a criminal defendant from conviction "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970).  The federal standard for determining the sufficiency of the evidence to support a jury finding is set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979).  Under *Jackson*, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime

beyond a reasonable doubt." *Id.* at 319 (emphasis in original); *see also Coleman v. Johnson*, 566 U.S. 650, 656 (2012) ("the only question under *Jackson* is whether that finding was so insupportable as to fall below the threshold of bare rationality"); *Cavazos v. Smith*, 565 U.S. 1, 2 (2011) (a reviewing court "may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury").

The *Jackson* standard "must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law." *Jackson*, 443 U.S. at 324 n.16; *Juan H. v. Allen*, 408 F.3d 1262, 1275-76 (9th Cir. 2005). The reviewing court should look to state law for the elements of the offense and then turn to the federal question of whether any rational trier of fact could have found the essential elements of the crime supported by sufficient evidence beyond a reasonable doubt. *See Johnson v. Montgomery*, 899 F.3d 1052, 1056 (9th Cir. 2018).

Further, when both *Jackson* and AEDPA apply to the same claim, the claim is reviewed under a "twice-deferential standard." *Parker v. Matthews*, 567 U.S. 37, 43 (2012). As noted by the Supreme Court:

> First, on direct appeal, "it is the responsibility of the jury−not the court−to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury." And second, on habeas review, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was 'objectively unreasonable.' "

*Coleman*, 566 U.S. at 651.

Here, the state court, although not citing to *Jackson*, reasonably determined there was sufficient evidence to support the jury finding Petitioner guilty of violating California Penal Code §§ 273a(a) and 273d(a). California Penal Code § 273a(a) provides that felony child endangerment occurs when, among a variety of other circumstances, there is "child abuse by direct assault." *Duran v. City of Porterville*, 2015 WL 3794930, at * 9 (E.D. Cal. June 17, 2015). A jury may find a defendant is guilty of child abuse under section 273(a) when their conduct is (1) willful and (2) committed "under circumstances or conditions likely to produce great bodily

harm or death." *Id.* (citing *People v. Sargent*, 19 Cal.4th 1206, 1215-16 (1999)). California Penal Code § 273d(a) prohibits the willful infliction of injury resulting from "a direct application of force by the defendant upon the victim." *Olea-Serefina v. Garland,* 34 F.4th 856 (9th Cir. 2022). A jury may find a defendant guilty of violating § 273d(a) when the defendant intentionally applies physical force to the victim that causes a wound. *Id.*

Petitioner does not explain how the state court decision was objectively unreasonable under controlling federal law. There was sufficient evidence for the jury to reasonably conclude that Petitioner caused the burns to F.'s feet, including testimony from two experts that accidental burning was highly unlikely in this case; evidence that the burn lines were straight and without splash marks, indicating that F. did not splash, fight back, or otherwise try to escape the water; testimony that the burn marks were not consistent with a child placing their own feet in scalding water; and evidence that Petitioner was the only adult in the kitchen with F. at the time of the incident. (Doc. Nos. 19-23 at 17:24-18:1; 19-21 at 31:8-32:3; 19-13 at 142:12-25; 19-21 at 30:14-25; 19-13 at 143:8-145:6; 19-14 at 176). Experts also testified that F.'s burns were likely the result of someone restraining his legs and holding him in the water, which could be done without causing any bruising. (Doc. Nos. 19-21 at 31:25-32:3; 19-13 at 143:4-7; 19-23 at 13:21-14:4). Dr. Satkowiak, who initially examined F. at the hospital, testified that based on his experience with over 200 burn injuries, he immediately identified F.'s injuries as likely a "non-accident trauma or inflicted injury" which required law enforcement intervention. (Doc. No. 19-21 at 27:20-29:16). The jury also heard evidence from the investigation about Petitioner's temper when the children made messes, and that Petitioner walked into a mess in the kitchen before F. was burned. (Doc. No. 19-13 at 118:6-17, 126:10-26, 325-236).

"*Jackson* leaves juries broad discretion in deciding what inferences to draw from the evidence presented at trial," and it requires only that they draw "'reasonable inferences from basic facts to ultimate facts.'" *Coleman v. Johnson*, 132 S.Ct. 2060, 2064 (2012) (citation omitted). "'Circumstantial evidence and inferences drawn from it may be sufficient to sustain a conviction.'" *Walters v. Maass*, 45 F.3d 1355, 1358 (9th Cir. 1995) (citation omitted). Thus, a rational trier of fact could have reasonably relied on the evidence presented to conclude that

16

Petitioner held F. and dunked him in the scalding hot water, causing the burn injuries to F.'s feet to sustain his child abuse and corporal injury convictions. In assessing a sufficiency of the evidence claim, it is not the Court's role to reweigh the evidence. *Cavazos*, 565 U.S. at 7 n.* (reweighing of the facts is precluded by *Jackson*); *Nevils*, 598 F.3d at 1170.

In summary, viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found beyond a reasonable doubt that Petitioner inflicted the injuries to F. within the meaning of child abuse and corporal injury to a child as defined by California law. As such, the state court's rejection of this claim was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent, nor based an unreasonable determination of the facts. The undersigned recommends the sole ground for relief in the Petition be denied.

## V. CERTIFICATE OF APPEALABIILTY

A petitioner seeking a writ of habeas corpus has no absolute right to appeal a district court's denial of a petition; he may appeal only in limited circumstances. *See* 28 U.S.C. § 2253; *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003). Rule 11 Governing § 2254 Cases requires a district court to issue or deny a certificate of appealability when entering a final order adverse to a petitioner. *See also* Ninth Circuit Rule 22-1(a); *United States v. Asrar*, 116 F.3d 1268, 1270 (9th Cir. 1997). A certificate of appealability will not issue unless a petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). This standard requires the petitioner to show that "jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El*, 537 U.S. at 327; *accord Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Because the petitioner has not made a substantial showing of the denial of a constitutional right, the undersigned recommends that the court decline to issue a certificate of appealability.

Accordingly, it is **RECOMMENDED**:

1. Petitioner's Petition for Writ of Habeas Corpus (Doc. No. 1) be denied; and

2. Petitioner be denied a certificate of appealability.

////

**NOTICE TO PARTIES**

These Findings and Recommendations will be submitted to the United States District Judge assigned to this case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within 14 days after being served with a copy of these Findings and Recommendations, a party may file written objections with the Court. *Id*.; Local Rule 304(b). The document should be captioned, "Objections to Magistrate Judge's Findings and Recommendations" and shall not exceed **fifteen (15) pages**. The Court will not consider exhibits attached to the Objections. To the extent a party wishes to refer to any exhibit(s), the party should reference the exhibit in the record by its CM/ECF document and page number, when possible, or otherwise reference the exhibit with specificity. Any pages filed in excess of the fifteen (15) page limitation may be disregarded by the District Judge when reviewing these Findings and Recommendations under 28 U.S.C. § 636(b)(l)(C). A party's failure to file any objections within the specified time may result in the waiver of certain rights on appeal. *Wilkerson v. Wheeler*, 772 F.3d 834, 839 (9th Cir. 2014).

Dated:    November 25, 2024

HELENA M. BARCH-KUCHTA
UNITED STATES MAGISTRATE JUDGE

18